## CIRCUIT COURT OF CAROLINE COUNTY

Thomas F. Stephens
and Gladys E. Stephens

v.

Dominion Bank of Richmond, N.A.

January 11, 1988

Case No. (Chancery) 87-75

By JUDGE WILLIAM H. LEDBETTER, JR.

Thomas F. and Gladys E. Stephens ("the Stephens") borrowed $41,000.00 in 1981 from the Bank of West Point, now Dominion Bank of Richmond, N.A. ("the Bank"). They executed a demand note dated August 21, 1981, and a deed of trust securing the debt was recorded the same day.

Notwithstanding the pay-on-demand format of that note, everyone agrees that the parties actually structured an installment payment loan. They used a ten-year amortization to calculate monthly payments, with the understanding that the interest rate and, consequently, the amount of monthly payments, would be renegotiated every two years.

Consistent with that understanding, the Stephens executed a second promissory note on September 19, 1981, in the principal sum of $41,000.00, bearing interest at 18%, payable in monthly installments of $738.76.

Two years later, as agreed, the parties renegotiated the interest rate. The Stephens executed a third note on September 20, 1983, in the principal sum of $37,456.33 (the principal balance of the loan), bearing interest at 13.5%, payable in twenty-three monthly installments of $640.06 and a twenty-fourth installment of $32,109.69 (the amount that would then be the principal balance of the loan) "subject to refinancing."

Pursuant to their understanding, the parties got together again in September of 1985 to renegotiate the interest rate and make a new note.

Kemp Smith, the bank officer who was dealing with the Stephens' loan, asked his assistant, Lynn Goldin, to obtain the principal balance figure for the new note. Ms. Goldin called Dominion Bankshares Mortgage Company and, she says, was given a pay-off figure of $24,111.72. She gave this figure to Mr. Smith who then met with the Stephens at their restaurant in Bowling Green.

At that meeting, the Stephens' daughter, Gladys L. Huff, who happened to be present, told Mr. Smith that the figure "didn't seem like enough money; it couldn't be right." He responded that the figure was accurate.

The Stephens then executed a new note, dated September 20, 1985, bearing interest at 12%. The principal amount of the note was $24,111.72, payable in monthly installments of $471.39, with an interest rate "change date" in the twenty-fourth month. A new $41,000.00 deed of trust, dated September 20, 1985, was recorded on October 3, 1985.

The figure which Mr. Smith used as the principal amount of the new note was incorrect. The balance owed on the loan, as of September 20, 1985, was $31,469.67. It was that figure which should have been inserted in the new note.

A few months later, the Bank caught the error and notified the Stephens. Mr. Smith traveled to Richmond to verify the error. In January of 1986, he met with the Stephens and thought that they understood the problem and would sign a corrected note. However, a few days later the Stephens refused to sign a new note.

However, the Stephens continued to make the installment payments called for in the note until July of 1986, when the Bank refused to accept any more of them because they were "not in the proper amount."

When the Stephens were notified of impending foreclosure by the trustees under the deed of trust, they filed a bill of complaint to enjoin the foreclosure.

On July 29, 1987, the court entered a temporary restraining order against collection of the note and foreclosure.

The Bank filed a responsive pleading and cross-bill. In its cross-bill, the Bank seeks reformation of the note

and an adjudication of the Stephens' default and amount of arrearage.

The Stephens filed an answer to the cross-bill.

The case was heard ore tenus on November 25, 1987. By agreement, counsel filed post-hearing memoranda in support of their respective positions.

From the beginning, the parties intended that the Stephens would repay the $41,000.00 which they borrowed from the Bank in 1981, together with interest at a variable rate to be recalculated every two years over the ten-year pay-back term of the loan. The evidence clearly establishes this intent and the parties' course of dealing consistent with it.

In furtherance of that undisputed arrangement, the parties were to "roll over," or refinance, the unpaid balance of the loan each time the interest rate was renegotiated, and that loan balance would become the principal amount of each new note.

The parties did this in 1983. They did it again in 1985. In 1985, however, the wrong figure was inserted in the new note.

The Stephens argue that since the wrong figure was inserted by the Bank, as result of the Bank's negligence, the Bank is now stuck with the consequences of that negligence. The instrument should not be reformed, they say, nor should they be required to pay more than the face amount of the 1985 note. Stated differently, the Stephens claim that they should be exonerated from repayment of approximately $7,000.00 of the sum they admittedly received because the Bank erred in preparing the new note which stands as evidence of their indebtedness.

This position is untenable.

Both parties intended that the principal amount of the new note would be the loan balance, whatever that might be. The original debt could be satisfied only if the correct loan balance appeared in the new note. The parties were *mutually mistaken* in their good faith belief, on September 20, 1985, that the principal amount of the new note reflected the correct loan balance.

The element of mutuality is not negated by the fact that the mistake resulted from an error of one of the parties. By definition, a mistake is always someone's fault. A mistake is, in essence, a fault. The prefix

"*mis*" means "wrong" or "wrongly." Every mistake is a wrong act done unintentionally.

> Most mistakes arise out of some degree of negligence. It is impossible, therefore, to fix any inflexible rule to determine the amount of [fault] necessary to deprive a party of relief . . . on account of mistake . . . . If a mistake has been mutual, the fact that the party who is to be injured thereby, if the mistake is not corrected, was negligent in making the mistake should not prevent equity from correcting it . . . . 13A M.J., *Mistake and Accident* § 8.

The mutuality exists in the fact that the mistake was not unilateral, i.e., was not harbored by only one of the parties. Rather it created a *misexpression* of the true intent of *both* parties.

The authorities all agree that a mutual mistake, over which equity has jurisdiction for reformation, exists where there has been a meeting of the minds, an agreement actually entered into, but the written instrument in its written form does not express what was really intended by the parties. See, 4 *Pomeroy's Equity* (5th ed.) § 1376, quoted in *Larchmont Properties v. Cooperman*, 195 Va. 784 (1954); Lile, *Notes on Equity Jurisprudence*, pp. 123-130.

Here, there was a meeting of the minds: both parties intended that the figure inserted in the new note be the amount of the Stephens' loan balance. The instrument does not express that true intent. The evidence on this point is clear and convincing, leaving but little, if any, doubt.

In such case, equity will reform the instrument to give true effect to the intent of the parties, despite a contrary expression which the parties mistakenly believed to memorialize their bargain. *Gibbs v. Price*, 207 Va. 448 (1966); 16 M.J., *Rescission, Cancellation and Reformation* sect. 29.

Accordingly, the note dated September 20, 1985, will be reformed to reflect the parties' intent to incorporate therein the correct loan balance of $31,469.67.

Unfortunately, reformation of the face amount of the note does not dispose of the controversy.

The Bank next contends that once the note amount is corrected, the monthly installments must be increased to provide a full pay-out over the remaining term of the note. With interest at 12%, the monthly payments on $31,469.67 would be $615.24; therefore, the argument goes, the court should rewrite the note to incorporate that figure.

Such a result does not follow. It is axiomatic that a court of equity cannot make a new contract for the parties corresponding to what the court may think the parties would have agreed upon, no matter how compellingly fair the new terms may seem. 13A M.J., *Mistake and Accident*, sect. 9.

To reform the face amount of a note so that it expresses the clear and obvious intent of the makers and payee is one thing; to tinker with other provisions of the note simply to satisfy someone's idea, no matter how sound or logical, of how the reformed note should be repaid is quite another matter.

As discussed above, the evidence is clear and uncontroverted that the parties intended the face amount of the new note should be the loan balance. That balance, on September 20, 1985, was $31,469.67. The note can be, and will be, reformed to express the real intent of the parties on that matter about which they were both mistaken. However, there is not one bit of evidence that the parties intended the monthly payments to be anything other than what is stated in the note. The Bank's contention that the principal amount was to be amortized at 12% over six years, thereby mandating monthly installments of $615.24, is without merit. This assumes a level payment schedule, with no balloon and no renegotiations of interest. Given the course of dealings of these parties regarding this loan, such assumptions are fallacious. First, other notes evidencing the debt had provided for balloon payments. Who is to say that if the Stephens had been told that the monthly payments were going to be $615.24 instead of $471.39, they would not have negotiated for lower monthly payments with a balloon payment at the end? Second, the amount of monthly installment could very well have varied, beginning in September of 1987, when either party had the right to renegotiate the interest rate. (The note states that despite the renegotiation feature, the interest

rate "may never be increased to more than 5%" -- obviously, another error in the terms of the new note.)

The court is of the opinion that its equitable powers in this cause are properly expended with the reformation of the face amount of the note, reflective of the true intent of the parties as proven by the evidence, and that the other terms and conditions of the note cannot now be redrafted to conform the note to proper banking practice or "reasonable" repayment procedures.

According to Mr. Richard Birnback, manager of the Bank's default division, the Stephens owe the Bank $41,336.78 (as of the date of the November 25th hearing). He arrived at this sum by starting with the correct loan balance as of September 20, 1985 ($31,469.67), adding all "arrearages" since that date, and crediting the Stephens with payments received since that date.

Among the "arrearages" are attorneys' fees; inspection fees; late charges; and seventeen months' unpaid installments at $640.06 each. For reasons that can best be described as abstruse, the Bank now claims that the Stephens should have been paying installments on their debt since July, 1986, not at the rate of $471.39 (the amount stated in the new note) or even $615.24 (the amount which the Bank claims should be inserted in the new note), but at $640.06, which was the amount of monthly installments in the 1983 note that the new note superseded.

Against the background of this case, the Bank's position that a court of equity should compel payment of these so-called arrearages in order to avoid foreclosure is patently unjust.

The Stephens do not stand before the bar of this court as wholly innocent, irreparably-injured victims of a banking error. They have reaped the benefits of $41,000.00 loaned to them by the Bank, and now they want to repay less than $34,000.00 of it. When the error was called to their attention in January of 1986, they refused to make a new note and contended that the Bank should suffer the loss from a "special fund" which they said the Bank had on hand for such contingencies.

Nonetheless, the Stephens did continue to make monthly payments under the terms of the new note, $5,185.29 in all, and stopped doing so only when, in July of 1986, the Bank refused to accept any more of them.

The Bank justifies its rejection of these payments by citing the legal principle that a creditor need not accept partial payments of a debt. The Bank conveniently ignores the corollary that such creditor *may* accept partial payments without waiving its rights regarding default at least where, as here, the instrument of indebtedness expressly reserves that right. Further, the Bank surely must have been aware that its rejection of timely installment payments in the exact amount called for in the new note would carry some risk in the event a court of equity were to correct the parties' mistake by reforming the face amount of the note while declining to rewrite the other terms of the instrument.

While refusing to accept payments called for in the new note and insisting that the Stephens either pay under the old (1983) note or not at all, the Bank took no legal action of its own to reform the mistake which its error had created. Instead, more than a year and a half after the mistake was discovered, and after refusing to accept any payments from the Stephens for a year, the Bank commenced foreclosure, an extrajudicial proceeding.

The Bank is entitled to the benefit of its bargain. As of September 20, 1985, that bargain was: (1) repayment of the loan balance in the amount of $31,469.67; (2) payment of interest at 12% per annum on the unpaid principal; and (3) a complete pay-back by the tenth anniversary of the loan, September 20, 1991.

The Bank is not entitled to benefit in any respect from its refusal to accept payments tendered under the terms of the new note or its failure to take prompt, reasonable action to correct the mistake that its error had caused. This means that the Bank is entitled to interest on its money for the period of time during which no payments were received (i.e., from July of 1986 to present), but it will not be allowed immediate collection of all unpaid installments. They were tendered and rejected. It follows that the Bank is not entitled to late charges or inspection fees, and there will be no award of attorney's fees.

The appropriate equitable relief in this case is as follows:

1. The relief sought by the Bank in its cross-bill for reformation of the principal amount of the note dated

September 20, 1985, will be granted. The other relief sought in the cross-bill will be denied.

2. Reformed as aforesaid, the note will remain in force and effect according to its terms.

3. In order to bring the reformed note current, the Stephens must promptly pay the Bank all interest accrued from the date of their last payment in July of 1986, calculated at 12% per annum on the unpaid principal of $26,284.88 ($31,469.67, reduced by eleven payments of $471.39 made by the Stephens between September 20, 1985, and July of 1986). If the parties cannot agree, the word "promptly" shall mean not later than forty-five days from the date of this opinion.